No. 807

First Circuit

___

WHITE v. LOUISIANA WESTERN RY. CO.

·

___

(June 16, 1931. Opinion and Decree.)

___

Griffin T. Hawkins and Cline, Plauche & Girod, of Lake Charles, attorneys for plaintiff, appellee.

Pujo, Bell & Hardin, of Lake Charles, attorneys for defendant, appellant.

MOUTON, J. Plaintiff suffered a head injury in 1921, while in the service of defendant company, then one of its employees. He brings this suit for the recovery of compensation under the provisions of the Employers' Liability Act.

He returned to his work with the company about one month after the accident. He continued in the service of the company, and suffered with headaches, dizziness and such slight indispositions, until September, 1929, when he ascertained from his phsyician that he was afflicted with epilepsy, and was told for the first time that it was the result of the injury he had received in 1921. The defendant company filed a plea of prescription of one year based on section 31 of Act No. 85 of 1926, p. 124, claiming that more than one year had run from the date of the accident which had occurred in 1921, and that plaintiff was barred from recovery.

Section 31 of Act No. 20 of 1914, p. 44, provides for the prescription of the action of the employee for compensation unless it is brought within one year from his injury or death. Here there is no death, and we will therefore address ourselves to the word "injury" used in the statute.

In Guderian v. Sterling Sugar & Ry. Company, 151 La. 59, 91 So. 546, the court held under act 1914 that prescription began to run from the time plaintiff became aware of the injury and not from its date.

In the instant case, plaintiff, after he was hurt, remained at home about one month, thought he had entirely recovered, and returned to his work. It was only after he suffered a stroke of epilepsy in September, 1929, that he became aware

or conscious that he had suffered actionable injury, and not long after, within one year from the time he discovered that he was suffering from epilepsy, he instituted the present proceedings.

It was in September, 1929, that plaintiff realized or became aware of the injury he had suffered, and, having brought his action within one year from that time, under Guderian v. Sterling Sugar & R. Co., 151 La. 59, 91 So. 546, above cited, the prescriptible period had not yet accrued.

Counsel for defendant contend that under Act No. 85 of 1926, amending section 31 of Act No. 20 of 1914, prescription begins to run, not from the injury, as previously provided, but from the date of the accident, and consequently, the accident having happened to plaintiff in 1921, much more than one year has expired since then, and that plaintiff's action is prescribed.

In its pure literal sense, an accident means to arrive suddenly, to happen; an occurrence or event of whatever kind. According to this literal meaning, it would have to be held that the Legislature was referring to any sudden and unexpected happening or occurrence, whether any injury or damage had been suffered or not. It is obvious that the legislators could not have any concern with any occurrence of that character in the enactment of this statute. We say this because it was enacted to provide compensation for damages which might result in personal injuries or death to employees while performing their services.

. The word "accident" is also defined to be: "An unforeseen occurrence, particularly if it be of a calamitous character. This is the most common use of the word." The Encyclopaedic Dictionary, vol. 1. This definition, according to the common use of the word, is in accordance with article 14, Civil Code, which says that the words of a law are to be taken according to their most usual signification, general and popular use.

It is in that sense that the word "accident" is used in the statue, and refers to some personal injury or damage, as it is evident that, for a mere accident or sudden unexpected happening where no injury or damage resulted, there would be no actionable right, and nothing to be lost by prescription or otherwise.

In connection with the foregoing, we will quote as appropriate thereto the following from the case of U. S. v. Katz, 271 U. S. 354, at page 357, 46 S. Ct. 513, 514, 70 L. Ed. 986:

"All laws are to be given a sensible construction; and a literal application of a statute which would lead to absurd consequences, should be avoided whenever a reasonable application can be given to it, consistent with the legislative purpose."

We therefore hold, as we had occasion to do in the case of West v. Industrial Lumber Co., 14 La. App. 224, 128 So. 678, that under Act No. 85, 1926, prescription begins to run from the time the employee realizes or becomes aware of his injury which is governed by the same rule recognized in Guderian v. Sterling Sugar & R. Co., 151 La. 59, 91 So. 546.

The defendant company filed the plea of prescription in the lower court, hereinabove discussed, which we find was properly overruled.

In this court defendant files the plea again alleging that according to the testimony of Dr. H. B. White, given at the trial, plaintiff had a serious and actionable cause of action for more than one year prior to the bringing of this suit.

The proof is that plaintiff went back into the service of defendant company about thirty days after the accident in 1921. He worked from that time to September, 1929, when he had his first stroke of epilepsy. In the intervening period between 1921 and September, 1929, he suffered occasionally with headaches and dizziness, and did not have the remotest idea, either springing from himself or from the advice of Dr. White or any other physician that he had a touch of epilepsy or should have any apprehension of such a trouble. It was only in September, 1929, that he was apprised by Dr. White of his affliction, and who sent him to the Hounsten Hospital, where other physicians told him he was suffering with that disease. It was certainly not before then that plaintiff awoke to the realization that he had "serious and actionable cause of action" for indemnification for the compensation he is now claiming. It was really later than September, 1929, that he became fully aware of his condition. It was somewhere about December, 1929, or perhaps a little later, that the diagnosis of Dr. White was confirmed by the other physicians at the hospital. He instituted his suit March 12, 1930, and well within one year from the time he became aware of his injury, and before the prescriptible period had accrued against his right of action. The plea of prescription filed here is also overruled.

## MERITS

The district judge rendered the following opinion on the merits:

"While working for the defendant railroad company as a brakeman, in August, 1921, the plaintiff received a head injury. He was off duty about a month, and having apparently fully recovered, he then went back to work, where he remained until January 12, 1930. He now has epilepsy. His first epileptic attack was had on September 21 or 25, 1929, and he has had several since that date. His disability is total and permanent. (Tr. 5, 6, P. 4.)

"The plaintiff claims that he has traumatic epilepsy, due to the head injury received in 1921, while the defendant urges that plaintiff's epilepsy is idiopathic, that is, of unknown origin, or as Dr. Martin expressed it, 'one's own disease originating inside one's self.' (Tr. 30.)

"The defendant's plea of prescription was overruled for written reasons filed in the record.

"Skull fractures often result in traumatic epilepsy, and the plaintiff contends that X-ray pictures taken of his skull since his epileptic attacks began show the fracture. This is the opinion of Dr. McKinney, an X-ray expert (Tr. 24-2) and of Dr. Tuten (Tr. 88). Defendant's witnesses, Drs. Marquis and Henderson, X-ray experts (Tr. 80; Deposition of Dr. Marquis) and Dr. Morrison were of the opinion that the pictures showed no skull fracture. This was also the opinion of Dr. Martin, expert called by the plaintiff (Tr. 36). The weight of the evidence on this point is with the defendant.

"However, all the experts testifying on the point, both for the plaintiff and the defendant, were of the opinion that head injuries not resulting in skull fractures, could and do cause traumatic epilepsy. Dr. McKinney (Tr. 24-2), Dr. Martin (Tr. 31), Dr. Watkins (Tr. 38), Dr. Hebert (Tr. 45), Dr. Morrison (Tr. 61), Dr. Henderson (Tr. 86), and Dr. Anderson, who said that only about two per cent. of brain injuries producing traumatic epilepsy are not fractures (Tr. 79).

"The plaintiff was 37 years old when he developed epilepsy, and the experts were unanimous in the opinion that a large proportion of idiopathic epilepsy cases develop before the age of 20, and a very small proportion develop after the age of 37. Dr. Anderson (Tr. 70), Dr. Morrison (see deposition), Dr. Tuten (Tr. 92), Dr. Marquis (see deposition), Dr. Kushner (Tr. 49, 50), Dr. Martin (Tr. 33), and Dr. Bordelon (Tr. 55). Dr. Watkins was of the opinion that idiopathic epilepsy seldom appeared after the age of 25 (Tr. 39). This is also the opinion of recognized text book authorities.

"The record clearly shows that the family history of White, examinations and tests made in his case, negative any contention that might be made that the plaintiff has epilepsy of any known cause, other than traumatic.

"While traumatic epilepsy usually develops within six to eighteen months from the injury (Dr. Martin, Tr. 32), it does sometimes develop many years later. Dr. Martin had a case where it developed six or seven years after the trauma (Tr. 32), and Dr. White had a case where traumatic epilepsy was six years in manifesting itself (Tr. 103). Dieulafey, a recognized authority on the subject, in his work 'A Text Book of Medicine,' records a case where the period of development of traumatic epilepsy was ten years. (X-1). Dr. Tuten and Dr. Watkins testified that such cases develop as late as seven, eight or nine years (Tr. 47-92), and Dr. Watkins said there was no time limit in such cases (Tr. 39).

"Dr. Anderson, a very learned expert on mental diseases, and a witness for the defense, had never seen, known, or read of a case of traumatic epilepsy developing as late as eight years after the injury (Tr. 66, 67, 68), but his testimony on this point is outweighed by that of the doctors mentioned in the preceding paragraph—two of whom had personal knowledge of cases where the development was from six to seven years—and by the writers on the subject.

"Testifying for the plaintiff, the following experts were of the opinion that plaintiff's epilepsy was caused by his head injury of 1921: Dr. McKinney (Tr. 25), Dr. Martin (Tr. 30), Dr. Watkins (Tr. 38), Dr. Hebert (Tr. 42), Dr. Kushner (Tr. 50, 51), Dr. Tuten (Tr. 89), Dr. White (Tr. 100), and Dr. Bordelon (Tr. 55).

"Dr. Morrison, a defense witness, was of the opinion that plaintiff's epilepsy was of unknown origin (Tr. 62), his testimony on cross examination being as follows:

" 'Dr. Anderson says it (plaintiff's epilepsy) could be part traumatic or idiopathic? A. Yes, I think it could be either.

" 'Q. The chances are about equal, would you say? A. Well, I don't know about that.' (Tr. 63.)

"Dr. Green, also for the defense, considering the long interval between the injury and the first epileptic attack, and saying that plaintiff's history showed an absence of headaches or other cerebral disturbances, was of the opinion that these facts 'make the case appear to me as a case of idiopathic epilepsy, rather than traumatic. However, the remote possibility of it being traumatic can not definitely be denied. (See his deposition.) In this connection it is important to note that between the date of injury and the development of the epilepsy, Dr. White, once or twice a year, was called to treat the plaintiff for headaches and dizzy spells. (Tr. 101, 102.) Later in his testimony this doctor, Green, said 'I consider it possible' that the injury caused the epilepsy. (Tr. 71.) Dr. Anderson said that 'most of the common and the remote causes of epilepsy' were not found to exist in White's case; that 'a great many of the common causes of convulsions and all the uncommon ones' were also found not to exist in this case, which was one of idiopathic or post traumatic epilepsy. (Tr. 73.) This witness hesitated to diagnose White's case as traumatic epilepsy, because it developed later that such form usually develops; because White's convulsions were general, while the general or universal rule in such cases is for the convulsions to be local; and because evidence of damage to the brain by scar, blood clot, etc. was wanting. Dr. Anderson said, however, that ten per cent. of the patients in traumatic cases show no such evidence. (Tr. 74, 75.) This doctor, who made a more detailed examination of the plaintiff than any other of the doctors, reported in writing as follows:

" 'I see the case we are dealing with either a so called idiopathic epilepsy or a post traumatic epilepsy, and it departs radically from the rules for either. It is impossible for me to state the exact causative factor with certainty.' (P-7.)

"Again, the doctor testified as follows:

" 'Q. If you really believed in this case this man had a serious brain injury in 1921, what would be your diagnosis of his present form of epilepsy? A. I do believe that he had.

" 'Q. You do believe it? A. Yes, sir.

" 'Q. Have you a fixed opinion as to what type of epilepsy this man has, and is that opinion so strong that you would

be willing for the court to act on it? A. Yes, sir.

" 'Q. Well, what type do you think he has? A. Traumatic. * * *

" 'Q. The sum and substance on that point is about this, is it not, you have not enough evidence at hand to diagnose this man's case positively, or with reasonable certainty, but that the evidence preponderates in favor of traumatic epilepsy? Is that about what you want to say? A. Just about, except for the word preponderates. I would say favors, because it is a very, very slight margin.' (Tr. 76, 77.)

"It will be noticed that eight experts testifying for the plaintiff, several of them being outstanding physicians and surgeons, were of the opinion that White has traumatic epilepsy. The opinion of these doctors was based on the facts that the plaintiff suffered a severe head injury in 1921; that such injury is a frequent cause of epilepsy; that idiopathic epilepsy rarely develops in a man as old as 37 years; and the fact that White's family history, examinations of him, and tests, excluded all the causes responsible for other types of epilepsy.

"Of the three witnesses who testified for the defense, Dr. Morrison practically admitted that White's epilepsy could be either traumatic or idiopathic, and this too was the testimony of Dr. Green. The third witness for the defense, Dr. Anderson, gave it as his 'fixed opinion' that White had traumatic epilepsy, and stated that his opinion was so strong that he was willing for the court to act upon it in this case. Moreover, this doctor admitted that he was absolutely unable to find any other cause for plaintiff's epilepsy than the injury of 1921. (Tr. 74, 75.)

"It is clear from this statement of the evidence that the plaintiff has made out his case by a fair preponderance of the evidence."

There is no error in that opinion.

Plaintiff proved his case with legal certainty, and is entitled to recover as was held below. The amount allowed was fixed in accordance with the compensation statute, and the increase demanded by plaintiff is denied.